**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **v.** | **NO.  20-205** |
| **ZYAIRE RILEY** | |
| *Register# 70007-066* | |

**O P I N I O N**

Defendant Zyaire Riley, a felon previously convicted of first-degree robbery in Pennsylvania, pled guilty to one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and now faces sentencing for this crime.  Defendant challenges the applicability of three sentencing enhancements sought by the Government, specifically:  (1) an upward adjustment for possessing a firearm with an obliterated serial number; (2) an upward adjustment for using a firearm in connection with another felony offense; and finally, (3) an upward adjustment for his prior robbery conviction, which the Government argues is a crime of violence under the Sentencing Guidelines.  On November 18, 2021, a hearing was held in which the Government presented evidence on the first two issues in the form of police investigation reports, security camera footage, and credible testimony from Special Agent James C. Hughes of the Bureau of Alcohol Tobacco and Firearms.

For the reasons explained below, in calculating the offense level the Court will not apply an enhancement for either an "obliterated" serial number or for the use of a firearm in connection with another felony offense, but it will include an enhancement for Defendant's prior robbery conviction.

1

## I.    BACKGROUND[1]

On December 23, 2019, Defendant Zyaire Riley was apprehended by Philadelphia Police officers while fleeing from a traffic stop.  Officers recovered a Smith & Wesson 9-millimeter semi-automatic firearm bearing a heavily scratched serial number covered in green paint from his left sock.  The firearm was submitted to the Firearms Identification Unit ("FIU") of the Philadelphia Police, which "raised" the serial number and determined it to be "EEB4799."  At the hearing, the Government could not clarify what was meant by "raising" a serial number and whether the FIU physically manipulated or otherwise made the serial number more legible.  The Government admitted into evidence a laboratory report by the FIU which describes that its methodology involved "[a] visual and physical examination."  Presently, it is possible to make out the entire serial number "EEB4799" by sight, albeit with some difficulty.

Three days prior to his arrest, on December 20, 2019 at approximately 8:24 p.m., Defendant went with two women, one of whom is his cousin, to the "Ice-Cold Beer Deli" ("Deli") located at the corner of 58th and Catherine Streets in Philadelphia, Pennsylvania. Defendant wore a bright yellow hoodie, a black jacket and a purple knit cap; the women accompanying him were dressed entirely in black.  He entered the store, but his two female companions remained outside.  The security camera footage shows them on the corner speaking animatedly to each other and with another woman who wore a long blue parka.  The women eventually entered the Deli, only to exit about a minute later with the Defendant and approximately four other people.  Upon exiting, the Defendant's two female companions began speaking with a man in a bright blue hoodie.  At first, the Defendant stood to the side of the

---

[1] The following facts are taken from the presentence investigation report, the Parties' pre-sentencing memoranda, and the evidence and testimony presented at the hearing held on November 18, 2021.  *See United States v. Greenslade,* 255 Fed. App'x 691, 692 (3d Cir. 2007) (facts in the presentence investigation report may be considered as evidence in determining whether to apply an enhancement).

conversation, but then moved to the middle and appeared to play the role of an intermediary.  He first spoke with the man in the blue hoodie, who walked away after their interaction, and then turned to speak with the two women.  Afterwards, he spoke to another person in grey and then walked out of the view of the security camera.  At this point, the Defendant's two female companions began to speak with each other again in an animated fashion, while the man in the blue hoodie and others gathered on the corner milled about and watched them.  One of the two women approached the man in the blue hoodie and reengaged in conversation with him, gesticulating emphatically as she spoke.  The two stood close to each other and their conversation appears to have been tense.  A few seconds into their conversation, a crowd gathered around them and Defendant emerged back in view.  He stood to the side, and once again, broke up the conversation by speaking with the woman he had arrived with while the man in the blue hoodie looked on.  As the Defendant spoke with the woman, a black car pulled up in front of the Deli and a woman in a brown jacket exited and stood near them.  After about a minute, Defendant stepped away and turned his back to the conversation.  By this time, a crowd of approximately eight to ten people had gathered on the Deli's corner.  Suddenly, at around 8:28 p.m., a fight broke out between the woman in the long blue parka and the woman in the brown jacket, ending when one appeared to slash the other in the face with a knife.  After this incident, the crowd briefly dispersed, and Defendant spoke to one of the two women with whom he had arrived at the Deli and another person dressed in black.  The crowd, including Defendant and his two female companions, then moved towards the black car in front of the Deli.  When the crowd was in front of the car, they shifted and began physically attacking the two women accompanying the Defendant.  The two women were thrown to the ground and a group of approximately four to eight people kicked and pummeled them into the sidewalk.  Two people

ran away from the melee.  Defendant attempted to pull one of the assailants off the women but

was unsuccessful.  He stood, spread his legs and, while still facing the group, began to quickly

back away at a diagonal angle maintaining a spread stance.  When he was about eight feet away

from the crowd, he reached into his waistband and pulled out what appears to have been a

firearm.  He continued to move away from the crowd.  Seconds later, at 8:29 p.m., when he was

approximately 25-30 feet away, the Defendant pointed his firearm towards the ground and fired a

single shot, which is shown by a flash on the security camera footage.  The crowd dispersed, and

the women stood up and got into their car.

## II.   DISCUSSION

### a.   The adjustment for the obliteration of the firearm's serial number under § 2K2.1(b)(4)(B)

The applicable United States Sentencing Guideline ("Sentencing Guideline" or

"Guideline") provides for an upward adjustment of four-points in the calculation of the total

offense level if the firearm's serial number was "altered or obliterated."  U.S. Sent'g Guidelines

Manual § 2K2.1(b)(4)(B).  The Government argues for this enhancement on the theory that the

serial number on the firearm recovered from Defendant was obliterated, not that it had been

altered.  The question at hand is therefore limited to whether the serial number was in such a

state that it was "obliterated."

The term "obliterated" is not defined in the Sentencing Guidelines or its commentary.  To

construe "obliterate" we must turn to the rules of statutory construction.  *See United States v.*

*Wong*, 3 F.3d 667, 670-71 (3d Cir. 1993) (interpreting the Sentencing Guidelines subject to the

rules of statutory construction).  When construing an undefined term, "we typically give the

[word] its ordinary meaning."  *Fed. Commc'n Comm'n v. AT&T Inc.*, 562 U.S. 397, 403 (2011)

(internal quotations and citations omitted); *see also United States v. Pray*, 373 F.3d 358, 361 (3d

Cir. 2004) (defining the word "imprisonment" as used in the Sentencing Guidelines in accordance with its ordinary usage.).

To "obliterate" connotes a total and utter destruction of something, such that there is no trace of it left behind. *See, e.g.*, *Obliterate, Black's Law Dictionary* (11th ed. 2019) ("1. to wipe out, rub off, or erase (a writing or other markings); 2. To remove from existence; to destroy all traces of."); *Obliterate, Merriam-Webster's Unabridged Dictionary*, https://www.merriam-webster.com/dictionary/obliterate (last visited November 29, 2021) ("To remove utterly from recognition or memory; to remove from existence: destroy utterly all trace, indication or significance of"); *Obliterate*, *Oxford English Dictionary*, https://www.oed.com/view/Entry/129732?rskey=iomItP&result=2&isAdvanced=false#eid (last visited November 29, 2021) ("To blot out (anything written, drawn imprinted etc.) so as to leave no distinct traces; to erase, delete, efface.").  It follows, then, that for a serial number to be "obliterated" it must be totally erased from the firearm such that it can no longer be read.  The Second Circuit has adopted this same definition of "obliterate."  *See United States v. St Hilaire*, 960 F.3d 61, 66 (2d Cir. 2020) ("Taking the dictionary definitions together in the context of a serial number, to obliterate is to efface entirely a character or a whole serial number, so that none of it is left.").

The Government advances a different reading of the word "obliterate," one that is quite different from the definition adopted here or by any other court.  It argues (supported by Special Agent Hughes' testimony) that the word "obliterate" is equivalent to the words it appears next to in two sections of the Guidelines, which include alter, tamper, and remove.[2]  U.S. Sent'g

---

[2] "Obliterate" appears only one other time in the Guidelines in the heading and commentary for Section 2B6.1, which pertains to the "removal, alteration, tampering with or obliteration" of vehicle identification numbers on motor vehicles or their parts.  U.S. Sent'g Guidelines Manual § 2B6.1, § 2B6.1 cmt.

Guidelines Manual §§ 2K2.1(b)(4)(B), 2B6.1, 2B6.1 cmt.  The Government's reading cannot be correct.  Interpreting obliterate, alter, tamper and remove to mean the same thing would render the terms listed redundant, if not wholly superfluous.  It is a court's duty "to give effect, if possible, to every clause and word of a statute."  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal citations and quotations omitted).  Courts are, accordingly, reluctant to adopt a reading which "treat[s] statutory terms as surplusage in any setting."  *Id.*

The Government also argues that "obliterate" should be interpreted in a manner consistent with certain non-binding decisions by Courts of Appeals outside of this Circuit.  The cases cited by the Government, however, either do not address the definition of "obliterated" [3] or are factually distinguishable and do not support its position.[4]  Further, only one of them drills down on the exact question at issue here.  *See United States v. Justice*, 679 F.3d 1251, 1254 (10th Cir. 2012) (construing "obliterate" to mean "to make *undecipherable or imperceptible* by obscuring, covering, or wearing or chipping away." (emphasis in original) (citing Webster's Third New International Dictionary 1557 (2002)).  Under the definition adopted by this court or by the Tenth Circuit, the serial number on the recovered firearm here would not qualify as "obliterated" because it was neither totally erased nor made undecipherable or imperceptible.

---

[3] Several of the cases cited by the Government do not define "obliterated" and only discuss the applicability of the enhancement where a firearm bore its serial number in multiple places and at least one instance was left untouched. *See, e.g.*, *United States v. Thigpen*, 848 F.3d 841, 845 (8th Cir. 2017) (denying defendant's challenge to the four-point enhancement where only one of the three serial numbers appearing on a firearm had been altered); *United States v. Warren*, 820 F.3d 406, 408 (11th Cir. 2016) (denying defendant's challenge to the enhancement where only one of the two serial numbers appearing on a firearm "had an altered or obliterated serial number."); *United States v. Serrano-Mercado*, 784 F.3d 838, 849-50 (1st Cir. 2015) (denying defendant's challenge to the enhancement where one serial number was "totally obscured" such that it was "obliterated" while a second serial number on the weapon remained "perfectly visible.").

[4] *United States v. Jones*, 643 F.3d 257, 259 (8th Cir. 2011) ("We need not decide whether the serial number on Jones's firearm was 'obliterated.'"); *United States v. Carter*, 421 F.3d 909, 912-13 (9th Cir. 2005) (noting that the dictionary definitions of "obliterate" could require total erasure of a serial number and that it would be reasonable to "embrace a requirement that a serial number be obliterated not just beyond the unaided eye, but also beyond scientific recognition." ).

Though the serial number has been damaged by green paint and scratch-marks, it remains legible by the naked eye.

To the extent that the Government's argument is that the meaning of the word "obliterate" in the Sentencing Guidelines is ambiguous, then the rule of lenity would nevertheless compel a result in the Defendant's favor.  The rule provides that where there is ambiguity in a criminal statute, any doubt must be resolved in the defendant's favor.  *United States v. Mobley*, 956 F.2d 450, 452 (3d Cir. 1992).  The rule applies to the Sentencing Guidelines.  *United States v. Flemming*, 617 F.3d 252, 269-70 (3d Cir. 2010).  A criminal statute is ambiguous only when traditional canons of statutory construction fail to clarify its meaning, such that either party's interpretation is plausible.  *Id.* at 270 ("Where there are two plausible readings of a guideline provision, we apply the rule of lenity and give the defendant the benefit of the reading that results in the shorter sentence." (quoting *United States v. Oetken*, 241 F.3d 1057, 1060 (8th Cir. 2001)).  While the rule is not technically applicable in this case because the meaning of "obliterate" is determinable, the rule would have nonetheless compelled the same result if "obliterate" was ambiguous.

While it is possible that the FIU restored the serial number by "raising" it in some sort of forensic process, the Government has provided no evidence to show that any such process was used, that it improved or otherwise altered the state of the serial number, or that the serial number was less legible now than when it was first recovered.  Indeed, the FIU's laboratory report, which reports only "a visual and physical examination" of the firearm, undermines any suggestion that the FIU somehow enhanced the serial number to render it legible.  Rather, it suggests that the FIU was able to determine the entirety of the firearm's serial number, EEB4799, through a "visual and physical examination" alone.

Nonetheless, the Government asks for an inference favor of applying the enhancement because the property receipt generated by the Philadelphia Police on the date of Defendant's arrest describes the firearm as having an "obliterated serial number."  But the record lacks any specifics on what the Philadelphia Police mean when they use the term:  perhaps "obliterate" describes any serial number that is not in pristine condition; or maybe it categorizes those serial numbers that are rendered difficult to read by someone's actions; or perhaps it encompasses only those serial numbers which require the use of sophisticated forensic technology to be seen.  We simply do not know.  We do not know what Philadelphia Police officers mean when they use the term "obliterate" in connection with a serial number, or even if it is used consistently between individual officers.  And it is of no matter here.  What controls is how the Court must read the word in the context of the Sentencing Guidelines guided by the principles of statutory construction.

Consequently, because the serial number has not been "obliterated" within the meaning of Section 2K2.1(b)(4)(B), the enhancement will not be applied.

### b.  The adjustment for the use of the firearm in connection with another felony offense under Sentencing Guideline § 2K2.1(b)(6)(B)

Neither will the four-point upward enhancement for the use of a firearm in connection with another felony offense under Sentencing Guideline § 2K2.1(b)(6)(B) be applied for the shot Defendant fired into the ground near the crowd gathered by the Ice-Cold Beer Deli on December 20, 2019.  Under the Sentencing Guidelines, a four-point upward enhancement applies if the Defendant "used or possessed any firearm or ammunition in connection with another felony offense. . . ."  U.S. Sent'g Guidelines Manual § 2K2.1(b)(6)(B).[5]  The Government contends that

---

[5] To apply the § 2K2.1(b)(6) enhancement, a court must find by a preponderance of the evidence that: (1) the defendant used or possessed a firearm; (2) that the defendant committed another felony offense, regardless of whether a criminal charge was brought, or a conviction was obtained; and, (3) that the firearm facilitated or had the potential of facilitating, the felony offense.  *See United States v. West*, 643 F.3d 102, 110 (3d Cir. 2011).  Further, an

the Defendant's act constitutes a felony—either aggravated assault or reckless endangerment of another person—under Pennsylvania law.  Defendant objects to this enhancement, arguing that his actions do not satisfy the requirements for these crimes, and that he was justified in discharging his firearm because the two women accompanying him would have sustained serious injury or death without his intervention.

The Government notes that Defendant was charged with aggravated assault-fear of imminent serious bodily injury to designated persons, which is a felony under Pennsylvania law. 18 Pa. C.S. § 2702(a)(6).  This form of aggravated assault criminalizes "attempts by physical menace to put any of the officers, agents, employees or other persons enumerated in subsection (c), while in the performance of duty, in fear of imminent serious bodily injury."  18 Pa. C.S. § 2702(a)(6).  The persons enumerated under subsection (c) include various government officers and employees, private detectives, and health care practitioners.  18 Pa. C.S. § 2702(c).

The Government has not provided any evidence to establish that any of the individuals on the corner by the Deli was a designated person under the statute.  More broadly, Defendant's conduct does not appear to satisfy any provision listed of the aggravated assault statute as there is nothing to suggest that the shot injured another person, or that the Defendant's actions amounted to an attempt to inflict bodily injury to another person.  18 Pa. C.S. §2702(a)(1)-(9) (requiring a person to attempt to cause or actually injure another person to be found guilty of aggravated assault).  Since the Government has failed to establish by a preponderance of evidence that Defendant's discharge of his firearm qualifies as an aggravated assault, the enhancement shall

---

adjustment to a sentence under the Guidelines shall be determined on the basis of  "relevant conduct," which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense" that were part of "the same course of conduct or common scheme or plan as the offense of conviction."  *See id.* at 110-111; U.S. Sent'g Guidelines Manual § 1B1.3(a)(1)(A), (a)(2).  Here, neither party challenges the relevancy of the shot Defendant fired on December 20, 2019 for the purposes of the § 2K2.1(b)(6) sentencing enhancement.

not be applied on this basis.  *See West*, 643 F.3d at 104-05 (citing *Grier*, 475 F.3d at 568) ("At sentencing, a district court should apply a preponderance of the evidence standard to all facts relevant to the Guidelines, including any finding that the defendant committed the offense of conviction in connection with another felony.").

Whether Defendant's shot qualifies as the reckless endangerment of another person presents a closer question.  Under Pennsylvania law, reckless endangerment is a second-degree misdemeanor[6] requiring proof of the following elements:  (1) a *mens rea* of recklessness, *i.e.*, a conscious disregard of a known risk of death or great bodily harm to another person; (2) a wrongful deed or guilty act ('actus reus'); and, (3) a danger of death or serious bodily injury to another person caused by the misdeed.  *See Commonwealth v. Emler*, 903 A.2d 1273, 1278 (Pa. Super. 2006).  Although the discharge of a firearm can cause death or serious bodily injury, "the mere act of discharging a firearm does not on its own constitute recklessly endangering another person."  *Commonwealth v. Shaw*, 203 A.3d 281, 284 (Pa. Super. 2019) (internal citation omitted).  To determine whether the discharge of a firearm qualifies as reckless endangerment, the whole context surrounding the action is considered, including: (1) the population in the area, *Commonwealth v. Brockington*, 230 A.3d 1209, 1216, 1216 n.5 (Pa. Super. 2020); (2) the reason for the discharge, *id.* at 1215-16; (3) the direction the firearm was aimed, *Commonwealth. v. Smith*, 447 A.2d 282, 284 (Pa. Super. 1982); (4) the distance between the shooter and any other person(s), *Shaw*, 203 A.3d at 286-87; and, (5) the number of rounds and bullets discharged, *Commonwealth v. Hartzell*, 988 A.2d 141, 142-43 (Pa. Super. 2009).  Of these considerations, significant weight is placed on the population density because "the potential danger caused by an

---

[6] Under the Guidelines, any offense punishable by more than one-year imprisonment is classified as a felony, regardless of the crime's classification under state law.  *See* U.S. Sent'g Guidelines § 2K2.1 n.14(c).  Reckless endangerment is punishable by two-years in prison, 18 Pa. C.S. § 2705, and thus qualifies as "another felony" for purposes of sentencing.

errant shot fired is far greater in an 'urban residential area'" like the city of Philadelphia. *Brockington*, 230 A.3d at 1216, 1216 n.5. Therefore, a situation which would not constitute reckless endangerment in a sparsely populated area might meet the threshold in a dense urban area like Philadelphia. *Compare Commonwealth. v. Kamenar*, 516 A.2d 770, 772 (Pa. Super. 1986) (reversing conviction of reckless endangerment where defendant fired a gun into an uninhabited, barren hillside) and *Smith*, 447 A.2d at 284 (reversing conviction of reckless endangerment where defendant fired his gun in a rural area, the victim was 25-30 feet away and it was not clear if the defendant had aimed at him) *with Brockington*, 230 A.3d at 1215-16 (finding that an unjustified "warning shot" fired at the sky in Philadelphia constituted reckless endangerment) and *Shaw*, 203 A.3d at 286-87 (finding that a random shot fired towards the ceiling in an occupied rowhome while another person was 25-30 feet away across the street in Philadelphia constituted reckless endangerment). Close attention is also paid to the shooter's motivation for discharging his firearm as it relates to his state of mind, and whether he acted with a conscious disregard of a known risk of death or great bodily harm to another. *Brockington*, 230 A.3d at 1215-16. If an actor had no reason to believe it was necessary to shoot his gun, for example, to stop a danger which threatened his life or his home, then he was likely reckless. *See, e.g.*, *id.* (holding that the defendant acted recklessly when she fired a "warning shot" upon hearing noises outside without any reason to believe that someone was breaking into her home).

Applied here, Defendant fired his gun in Philadelphia, a densely populated city, so his shot was more dangerous than it would have been in a rural area. It is reasonable to conclude that his action placed the individuals nearby, including those gathered by the Ice-Cold Beer Deli and others residing in the area, in danger of death or serious bodily injury by a ricocheting bullet. Defendant, however, did not discharge his gun recklessly—his actions demonstrate that he

appreciated the danger posed by his weapon but believed that it was necessary to use it because the two women with whom he went to the Deli were being beaten by a large group of people. Before firing a shot, he distanced himself from the group near the Deli by approximately 25-30 feet and aimed towards the ground rather than toward any person at the corner. No one was in his immediate vicinity when he discharged his gun, and it does not appear from the security footage that he was aiming to injure anyone. Accordingly, Defendant did not have a *mens rea* of recklessness, and thus, did not commit the offense of recklessly endangering another person.

Indeed, if, as it seems from the security footage, Defendant discharged his gun to protect his two female companions from being attacked, his action is justified as the protection of a third-person under Pennsylvania law. *See* 18 Pa. C.S. § 506. In Pennsylvania, a person who employs force to protect a third-party victim is justified if he: (1) would be justified in using force to protect himself if he were in the victim's position; (2) believes the victim would be justified in using force; and, (3) believes that his intervention is necessary for the protection of such other person. *Id.* Here, the record and surveillance footage show that the two women were being beaten by a large crowd of people. At no point during Defendant's five-minute trip to the Deli did he display any aggression or hostility towards anyone on the corner or otherwise escalate the situation. Rather, he tried to deescalate the situation using less severe means several times. He repeatedly intervened in the conversations between his companions and others gathered on the corner, physically moving between those engaged in conversation and speaking to both parties until the conversations ceased. Once the crowd began physically attacking the two women, he tried to pull one of the assailants off, but his efforts were unsuccessful. His one warning shot, which was not directed at the crowd and fired about 25-30 feet away, dispersed the crowd and protected the two women from further beating.

Accordingly, the Government's request for an enhancement for Defendant's discharge of his firearm on December 20, 2019 shall be denied.

### c.  The adjustment for a prior conviction for a crime of violence under Sentencing Guideline § 2K2.1(a)

The Government advocates for a base offense level of 20 because, in its view, the Defendant's 2017 first-degree robbery conviction under 18 Pa. C.S. § 3701(a)(1) constitutes a crime of violence under the Sentencing Guidelines.  Accordingly, the Government argues that subsection 2K2.1(a)(4) is applicable, which provides that if "the defendant committed any part of the instant offense subsequent to sustaining one felony conviction of [] a crime of violence. . . " then the base offense level for his crime is 20.  *See* U.S. Sent'g Guidelines Manual § 2K2.1(a)(4)(A).  Defendant, on the other hand, contends that subsection 2K2.1(a)(6), which provides for a base offense level of 14, applies because his prior robbery conviction does not qualify as a predicate crime of violence.  *See* U.S. Sent'g Guidelines Manual § 2K2.1(a)(6).

As this is a notoriously complex area of law, it is necessary to make clear the legal framework to properly situate the analysis that follows.  *See, e.g.*, *Mathis v. United States*, 136 S. Ct. 2243, 2264 (2016) (Breyer, J., dissenting) (describing the analysis as a "legal tangle" that is "mind bending in its application." (internal citations and quotations omitted)).  Determining whether Defendant's 2017 robbery conviction qualifies as a crime of violence under the Sentencing Guidelines will require answering the following questions:  (1) is the Pennsylvania robbery statute, 18 Pa. C.S. § 3701(a)(1), an indivisible or a divisible statute such that the categorical or modified categorical approach applies, respectively?; (2) does it constitute a crime of violence under the Guidelines?

The Guidelines provide two possible definitions of "crime of violence" under two different clauses.  The first, "the elements clause," defines a crime of violence as one which "has

as an element the use, attempted use, or threatened use of physical force against the person of another." *See* U.S. Sent'g Guidelines Manual § 4B1.2(a)(1). The second is known as "the enumerated clause" and lists several crimes that qualify as crimes of violence. U.S. Sent'g Guidelines Manual § 4B1.2(a)(2). Relevant to the case at hand, this list includes robbery. *Id.*

To determine whether a prior conviction constitutes a crime of violence under either the element or enumerated clauses requires the application of one of two tests: the "categorical approach," or its closely related variant, the "modified categorical approach." The categorical approach serves as the default test and applies to the vast majority of state criminal statutes. *Descamps v. United States*, 570 U.S. 254, 263-64 (2013). The modified categorical approach, on the other hand, applies in the narrow range of cases where the prior conviction was for the violation of a "divisible statute," *i.e.*, a statute which sets out one or more elements of the offense in the alterative. *Id.* Statutes which are scrutinized under the categorical approach are called "indivisible" statutes because they, put very simply, "set[] out a single set of elements to define a single crime." *United States v. Chapman*, 866 F.3d 129, 134 n.5 (3d Cir. 2017); *United States v. Blair*, 734 F.3d 218, 223 (3d Cir. 2013) ("A statute that includes alternative elements is said to be 'divisible,' while one that does not is 'indivisible.'" (internal citation omitted)).

In applying the categorical approach to the elements clause of the Guidelines, a court considers whether the use, attempted use, or threatened use of physical force against another person is categorically an element of the conviction. *United States v. Ramos*, 892 F.3d 599, 606 (3d Cir. 2018). If the criminal statute underlying prior conviction has such an element, "then the statute proscribes a predicate crime of violence within the meaning of Guidelines." *Id.* If instead, the statute "lacks such an element, it 'sweeps more broadly than the Guidelines' definition, and a prior conviction under the statute cannot serve as a [] predicate—even if the

defendant actually committed the offense by using, attempting to use, or threatening to use physical force against another person." *Id.*  With respect to the enumerated clause, a sentencing court assesses whether the elements of the Defendant's prior conviction match the elements of the so-called "generic version" of the same crime.  *Mathis*, 136 S. Ct. at 2247.  The "generic version of a crime" is something of a legal fiction but is understood to be the common definition of the offense.  *See United States v. Brown*, 765 F.3d 185, 189 (3d Cir. 2014).  In divining the elements of the generic version of the crime, courts examine the Model Penal Codes, state laws, and learned treatises.  *United States v. Graves*, 877 F.3d 494, 502 (3d Cir. 2017) (internal citations and quotations omitted).  The prior state conviction will qualify as a crime of violence "only if its elements are the same as, or narrower than, those of the generic offense." *Id.* at 501 (internal citations and quotations omitted).  If the state statute criminalizes a broader swath of conduct than the generic offense, however, then it is overbroad and cannot enhance a defendant's sentence.  In applying the categorical approach, the sentencing court is prohibited from inquiring into the facts and pleadings underlying the prior state conviction.  *Mathis*, 136 S. Ct. at 2248 (describing facts as "extraneous to the crime's legal requirements" such that federal law "cares not a whit about them.").

The modified categorical approach, in slight contrast, permits a sentencing court to first consult a limited class of documents from the underlying state conviction known as "*Shepard* documents." *Descamps*, 570 U.S. at 257, 262-63.  The purpose of this consultation is "only to determine which of alternative elements in a divisible statute formed the basis of the defendant's conviction." *Id.* at 278.  Accordingly, the modified categorical approach is seen as a "tool" to assist in the implementation of the categorical approach. *Id.* at 262, 264.  Consequently, a sentencing court is still prohibited from discerning the *facts* of the prior conviction when it

reviews the *Shepard* documents; its sole task is to identify the legal elements of the crime for which the Defendant was convicted. *Id.* at 263 (explaining that the modified categorical approach "retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime."). After determining the elements forming the basis of the defendant's prior conviction, the sentencing court reverts to the categorical approach and "compare[s] the elements of the crime of conviction (including the alternative element used in the case) with the elements of the generic crime.'" *Id.* at 257, 263-64. To be clear, under the modified categorical approach, only the elements of the convicted crime are considered; the other elements of the statute that were not part of the Defendant's conviction are not assessed against the generic version of the crime.

Defendant contends that the Pennsylvania robbery statute is indivisible and that it does not qualify as a "crime of violence" under the elements clause because one subsection of the robbery statute does not require the use of force. In the alternative, he argues that even if the Pennsylvania robbery statute is divisible, none of its subsections qualifies as a crime of violence under either the elements clause or the enumerated clause. With respect to the elements clause, he states that one of the three subsections does not require any degree of force, so it could not qualify; the remaining two subsections would not qualify because they provide for a *mens rea* of recklessness and are ineligible under the Supreme Court's June 2021 decision in *Borden v. United States*. With respect to the enumerated clause, he argues that the Pennsylvania robbery statute is not a crime of violence because it criminalizes recklessness, and thus sweeps more broadly than the generic version of robbery, which requires intentional conduct. The Government, on the other hand, argues that the Pennsylvania robbery statute is divisible, and that the elements forming the basis of Defendant's conviction qualify as a crime of violence under

both the elements and the enumerated clauses.

### 1.  DIVISIBILITY OF 18 Pa. C.S. § 3701(a)(1)

Beginning first with the divisibility of the Pennsylvania robbery statute, on at least four

occasions the Third Circuit has held that the precise statute at issue here is divisible.  In *United

States v. Blair*, the first of these cases, the Third Circuit first considered the divisibility of the

Pennsylvania robbery statute and held that it was "obviously divisible" because it "clearly laid

out alternative elements."  734 F.3d at 225.  The Third Circuit affirmed this holding five years

later in *United States v. Peppers*.  899 F.3d 211, 232 (3d Cir. 2018).  In *Peppers*, the Third

Circuit bolstered its holding in *Blair* with reasoning from the Supreme Court's decision in

*Mathis v. United States*, which stated that a criminal statute is divisible where the statutory

alternatives carry different punishments.  *Id.* (citing *Mathis*, 126 S. Ct. at 2256).  The Court of

Appeals noted that the subsections under the Pennsylvania robbery statute carry different grades

of punishment, further confirming the divisibility of the statute.  *Id.* (citing 18 Pa. C.S.

§3701(b)).  Later that year, albeit in a non-precedential opinion, the Third Circuit reaffirmed its

holding in *United States v. Heng Khim*, over the defendant's objection that *Blair* had been

abrogated by intervening Supreme Court decisions, namely, *Mathis*.  748 Fed. App'x 440, 443

(3d Cir. 2018).  Finally, in its 2020 decision in *United States v. McCants*, the Third Circuit

evaluated the divisibility of a New Jersey robbery statute and, in the course of its analysis,

reaffirmed the divisibility of the Pennsylvania robbery statute.  952 F.3d 416, 426-27, 426 n.2

(3d Cir. 2020).

In light of the Third Circuit's holdings, it is clear that the statute at issue in this case,

18 Pa. C.S. § 3701(a)(1), is divisible.  Consequently, the modified categorical approach applies

and the Court may consider the *Shepard* documents from the Defendant's underlying robbery

conviction.  Because the Defendant pled guilty to these charges, the list of approved *Shepard*

documents are:  "the terms of the charging document, the terms of a plea agreement or transcript

of colloquy between [the] judge and defendant in which the factual basis for the plea was

confirmed by the defendant, or to some comparable judicial record of this information."  *Blair*,

734 F.3d at 225 (quoting *Shepard v. United States*, 544 U.S. 13, 26 (2005)).  Here, the Defendant

produced a copy of the terms of the plea agreement from his 2017 conviction, which indicates

that he was convicted under subsection (ii) of the statute.  This subsection provides:  "A person is

guilty of robbery if, in the course of committing a theft, he:  (ii) threatens another with or

intentionally puts him in fear of immediate serious bodily injury."  18 Pa. C.S. § 3701(a)(1)(ii).[7]

The remainder of the analysis considers whether this subsection constitutes a crime of

violence under the elements or enumerated clauses.

## 2.  18 Pa C.S. § 3701(a)(1)(ii) CONSTITUTES A CRIME OF VIOLENCE UNDER BOTH THE ELEMENTS AND ENUMERATED CLAUSES

Defendant contends that his 2017 conviction under Section 3701(a)(1)(ii) fails to qualify

as a predicate crime of violence under both the elements and enumerated clauses for one

reason—the provision of the Pennsylvania robbery statute forming the basis of Defendant's

conviction requires a *mens rea* of recklessness while both the elements and enumerated clauses

require the more culpable states of mind of intent or knowledge.  Ergo, Defendant reasons that

Section 3701(a)(1)(ii) criminalizes a broader swath of conduct than permitted by either clause.

His argument under the enumerated clause is premised on the fact that generic robbery requires

an intent level of purpose, or knowledge.   His argument against the elements clause invokes the

Supreme Court's June 2021 decision in *Borden v. United States*, which held that a *mens rea* of

recklessness cannot qualify as a crime of violence under the elements clause of the Armed

---

[7] Neither party argues that subsection (ii) of the statute should be further divided between "threaten[ing]" another, and "intentionally put[ting] him in fear," so this subsection will be considered as a whole for the remainder of the analysis.

Criminal Career Criminal Act.  141 S. Ct. 1817 (2021).

The first step of the analysis is to determine the culpability required by Section 3701(a)(1)(ii).  The second half of this provision explicitly specifies a *mens rea* of intent because it states that a person is guilty of robbery where he "*intentionally* puts [another] in fear of immediate serious bodily injury" during a theft.  18 Pa. C.S. § 3701(a)(1)(ii) (emphasis added).  However, there is some debate between the Parties as to what the *mens rea* is for the first half of subsection (ii), because it does not specify the state of mind required.  The first half of the provision defines robbery as theft accompanied with a threat of serious bodily injury.  *Id.* The Pennsylvania Penal Code provides default levels of culpability, stating that, "when the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly."  18 Pa. C.S. § 302(c).  Based on this provision, Defendant argues that the least culpable mental state applicable to his robbery conviction is recklessness.  The Government counters that it is inconceivable to imagine a case where someone recklessly threatens serious bodily injury, and therefore the required mental state must be intent or knowledge.

It is evident from the statutory text that 18 Pa. C.S. § 3701(a)(1)(ii) demands a more culpable state of mind than recklessness.  In Pennsylvania, an undefined term in a statute is construed according to its ordinary usage.  *Commonwealth v. Kelley*, 801 A.2d 551, 555 (Pa. 2002) (stating that Pennsylvania courts "construe non-technical words and phrases in statutes, which remain undefined, according to their ordinary usage."); *Fed. Commc'n Comm'n*, 562 U.S. at 403 (2011).  Pennsylvania courts considering the ordinary meaning of "threat" have defined it as requiring an intent to harm another:  (1) "A communicated intent to inflict harm or loss on another or on another's property. . . ." *Interest of J.J.M.*, 219 A.3d 174, 180 (Pa. Super. 2019)

(citing *Threat*, *Black's Law Dictionary* (11th ed. 2019)); (2) "a declaration, express or implied, of an intent to inflict loss or pain on another. . . .", *Id.* (citing *Threat*, *Black's Law Dictionary* (11th ed. 2019)); (3) an indication of something impending and usu[ally] undesirable or unpleasant", *Id.* (alterations in original) (citing *Commonwealth v. Baker*, 766 A.2d 328, 330 n.5 (Pa. 2001)); and, (4) "an expression of intention to hurt, destroy, punish, etc." *Id.* (citing *Baker*, 766 A.2d at 330 n.5). These definitions indicate that a threat requires that the assailant outwardly exhibit an *intent* to harm another, which in turn, implies that a person must act with purpose or knowledge when they make a threat. Purpose and knowledge are the most culpable states of mind. A person acts purposefully when he "consciously desires" a particular result; he acts knowingly when he is aware that a result is practically certain to follow from his conduct. *Borden*, 141 S. Ct. at 1823 (internal citations and quotations omitted). It is difficult to imagine how a person would outwardly show that he means to inflict harm on another without being "practically certain" that his conduct would constitute a threat. Cases interpreting the degree of culpability required by Section 3701(a)(1)(ii) are in accord and indicate that the provision requires a mind guilty of more than just recklessness. *See, e.g.*, *Commonwealth. v. Fisher*, 2015 WL 9306912, at *14 (Pa. Super. 2015) ("[R]obbery includes . . . a greater mens rea of intent"); *Commonwealth v. Thomas*, 546 A.2d 116, 118-19 (Pa. Super. 1988) ("The proper question is whether the threat *intended* or posed by appellant was *calculated* to inflict fear of serious bodily injury." (emphasis added); *Commonwealth v. Garcia*, 479 A.2d 473,477 n.3 (Pa. 1984). ("[W]here the word "intent" describes the culpable mental state for an element of an offense, it is defined as the actor's "conscious" object to engage in conduct of that nature or to cause such a result. . . .Section 302(b)(1)(i) of our Crimes Code now requires such conscious desires as a mental element of a variety of serious crimes, including most of the old common law felonies,

e.g. murder, robbery, burglary and that form of theft which was called larceny.").  The commentary to the Model Penal Code also states that the "term 'threaten' implies purposeful behavior."  *See also* A.L.I., Model Penal Code and Commentaries § 222.1 (1980).

Because "threat" requires intent or purpose, the entirety of the provision which forms the basis of Defendant's 2017 conviction requires a higher level of culpability than recklessness. *Borden* therefore does not bar the conviction as serving as a predicate offense under the elements clause of Section 4B1.2 of the Guidelines.[8]

Defendant's prior conviction also satisfies the "force" requirement under the elements clause.  The elements clause defines a crime of violence as one which "has as an element the use, attempted use, or threatened use of physical force against the person of another."  *See* U.S. Sent'g Guidelines Manual § 4B1.2(a)(1).  It is indisputable that the conduct criminalized by § 3701(a)(1)(ii), namely, conduct threatening or intentionally putting another in fear of immediate serious bodily injury, has an element of a threatened use of physical force against another. *See* 18 Pa. C.S. § 2301 (defining serious bodily injury as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.").  Moreover, as explained above, the provision requires a *mens rea* of intent and is therefore not barred from qualifying as a predicate offense under *Borden*.  Consequently, Defendant's 2017 robbery conviction constitutes a crime of violence and enhances the base level of his sentence to 20.

---

[8]Although *Borden* considered the elements clause under the Armed Career Criminal Act ("ACCA"), its reasoning has been extended to apply to the "sufficiently similar" elements clause under the Sentencing Guidelines. *See United States v. Quinnones*, 16 F.4th 414, 420 n.11 (3d Cir. 2021).  In *Borden*, the Supreme Court held that a prior conviction for aggravated assault did not qualify as a violent felony under the elements clause of the ACCA because the aggravated assault required only a mental state of recklessness.  141 S. Ct. at 1822, 1834.  For a prior conviction to qualify as a violent felony under the ACCA's elements clause, the Government must show that it entailed the "use, attempted use, or threatened use of physical force against the person of another."  *Id.* at 1822.  The Court held that the term "against" required the active deployment of force against another, and thus only covered purposeful or knowing acts.  *Id.* at 1826-27.

Turning next to the analysis under the enumerated clause, we must first articulate the meaning of "generic robbery" and determine whether Section 3701(a)(1)(ii) criminalizes a broader range of conduct.  The definition of "generic robbery" is "the taking of property from another person or from the immediate presence of another person by force or by intimidation." *United States v. Scott*, 14 F.4th 190, 196 (3d Cir. 2021) (internal citations and quotations omitted).  Robbery had a similar definition at common law, which was "the felonious and forcible taking from the person of another of goods or money to any value by violence or putting him in fear."  *Gov't of Virgin Islands v. Carmona*, 422 F.2d 95, 98 (3d Cir. 1970) (quoting 4 W. Blackstone, Commentaries on the Laws of England 241 (1769)); *United States v. Depass*, 510 Fed. App'x 119, 121 (3d Cir. 2013); *Commonwealth v. Darcy*, 66 A.2d 663, 673 (Pa. 1949). These definitions are consistent with those offered by both the Defendant and the Government.

It is clear that in requiring a threat of serious bodily harm, Section 3701(A)(1)(ii) requires more significant harm than that encompassed by generic robbery.  *See, e.g.*, *Commonwealth v. Snelling*, 4 Binn. 379, 383-84 (1812) (holding that the taking of a watch with so little violence that the victim did not know it was taken still qualified as a robbery under common law.).  In that sense, Defendant's crime of conviction is narrower than the generic offense.

Defendant, however, argues that the robbery statute sweeps more broadly than the generic definition of robbery because generic robbery requires a more culpable mental state than recklessness.  As previously explained, Section 3701(a)(1)(ii) clearly requires intent, knowledge or purpose to harm the victim.  Therefore, the provision of the Pennsylvania robbery statute forming the basis of Defendant's prior conviction does not proscribe a greater degree of conduct than generic robbery.

That said, it is far from clear that generic robbery even requires the highest culpability

levels of intent, purpose or knowledge with respect to the violence element of the charge; it only requires that the assailant take property in a manner that elicits fear from the victim. Neither the Model Penal Code nor the definition of robbery at common law required a higher intent for the force element of robbery. At common law, robbery was an aggravated form of larceny, and requiring an intent to steal for personal gain and the use of force, violence or intimidation. 4 W. Blackstone, Commentaries on the Laws of England 230, 232, 242 (1769); *Carter v. United States*, 530 U.S. 255, 278-79 (2000) (Ginsburg, J., dissenting) (describing the definition of robbery in the time of Blackstone); *Darcy*, 66 A.2d at 673. While the definition of robbery at common law specifies that the assailant must have an intent to steal, nowhere does it also require that he hold a specific intent with respect to force. In further support, the commentary to the Model Penal Code notes that recklessness suffices to establish force for robbery. *See* A.L.I., Model Penal Code and Commentaries § 222.1 (1980) ("When injury is actually inflicted, even though recklessly, the willingness of the actor to expose the victim to serious harm is sufficiently demonstrated."). Thus, a reckless mental state is sufficient to establish generic robbery. Consequently, as Section 3701(a)(1)(ii) requires a state of mind at least equal to generic robbery, it circumscribes an equal or narrower range of conduct and qualifies as a predicate offense under the enumerated clause.[9]

As Defendant's 2017 robbery conviction constitutes a crime of violence within the meaning of either the enumerated or elements clauses of the Sentencing Guidelines, the base level for Defendant's sentence shall be enhanced to an offense level of 20.

## III.    CONCLUSION

---

[9] If the provision forming the basis of Defendant's conviction required only recklessness, as Defendant argues, his prior conviction would still constitute a crime of violence under the enumerated clause because it would be consistent with the requirements of the generic offense.

In conclusion, the Government's request for an upward enhancement for a prior conviction for a crime of violence shall be granted.  The Government's requests for upward enhancements for the obliteration of the firearm's serial number and the use of the firearm in connection with another felony shall be denied.

An appropriate order follows.

**BY THE COURT:**

*/s/ Wendy Beetlestone*

_____

**WENDY BEETLESTONE, J**.